Argued and submitted July 9, 2012, reversed and remanded February 21, 2013

Jaswinder SINGH,
*Plaintiff-Appellant,*

*v.*

Terence S. McLAUGHLIN,
*Defendant-Respondent.*
Marion County Circuit Court
10C13586; A147850

297 P3d 514

George W. Kelly argued the cause and filed the briefs for appellant.

Ralph C. Spooner argued the cause for respondent. With him on the brief were Melissa J. Ward and Spooner & Much, P.C.

Before Schuman, Presiding Judge, and Wollheim, Judge, and Nakamoto, Judge.

NAKAMOTO, J.

## NAKAMOTO, J.

Plaintiff, who ran a convenience store, was accused of stealing from that store and was arrested for theft. After the charges were eventually dismissed, he brought this tort action against defendant, an attorney who represented the store, alleging claims for false imprisonment, malicious prosecution, and abuse of process—each claim arising out of defendant's alleged participation in events surrounding plaintiff's arrest. The trial court granted defendant's motion for a directed verdict on all claims and entered judgment accordingly. Plaintiff now appeals that judgment, and we reverse and remand.

Because the appeal arises from defendant's motion for a directed verdict, we set out the facts presented at the jury trial in the light most favorable to plaintiff. *Mauri v. Smith*, 324 Or 476, 479, 929 P2d 307 (1996). US Market 107 is a convenience store owned by a corporation of the same name (US Market #107, Inc.). The corporation, in turn, is owned in equal shares by Bains, who is plaintiff's brother, and Ditta. Ditta's son-in-law, Sidhu, is the corporation's president. Bains and Sidhu's brother, Din, jointly own another store, US Market 105.

In 2004, plaintiff was hired to run US Market 107 and US Market 105, and he went back and forth between the stores on a daily basis. Subsequently, a dispute arose between Bains and the other principals, which resulted in litigation as well as an attempt in January 2008 by Sidhu and Din to relieve plaintiff, their adversary's brother, of his duties at both stores. Bains successfully opposed plaintiff's removal, and plaintiff remained employed at the markets, despite the ongoing feud and pending business litigation.

Plaintiff remained in charge of the stores until June 26, 2008. On that day, plaintiff began his workday at US Market 105 and, by late afternoon, was working at US Market 107. The latter store is under the surveillance of seven video cameras, which record what happens inside and outside the store and send a live feed to US Market #107, Inc.'s offsite office (the corporate office). A surveillance video from 4:00 p.m. on June 26, 2008, shows plaintiff behind

the counter, serving customers. The video further shows, at 4:13 p.m., an employee named Ivan exiting the store with a handcart loaded with empty bottles. In the footage, Ivan proceeds approximately 30 feet along a sidewalk, passes plaintiff's truck, stops at a storage room on the side of the store, and then loads bottles into the storage room; at the storage room, Ivan is assisted by another employee, Pedro. Video from another camera shows that, during this time, plaintiff remained in the store behind the counter, serving customers. The video shows plaintiff briefly leaving the store at 4:22 p.m. to retrieve the empty handcart from the storage room.

Back at the corporate office, the live feed of those events on video was being monitored by Kuenzi, a private investigator who had been hired to investigate fraud at US Market 107. After watching the live feed shortly after 4:00 p.m., Kuenzi asked a nearby office worker to watch a replay of what she had just seen; she then showed the same footage to Mumey, who also was at the corporate office and had been hired to uncover possible fraud at the store (specifically, to count cigarettes and lottery tickets and report shortages). Kuenzi and Mumey agreed that the video evidenced theft of beer (full cases rather than empty bottles) from the store *by plaintiff*.

At 4:30 p.m., Kuenzi phoned defendant, an attorney who had been retained by US Market #107, Inc., to oversee the investigation of the store.[1] Kuenzi told defendant that she had observed video of plaintiff removing beer from US Market 107. She also told him, "I think * * * you need to come down and * * * take a look at this, because I think I have probable cause for * * * an arrest." Defendant then went to the corporate office, where Kuenzi further described what she had seen; defendant then watched the video himself.

---

[1] The record is rather convoluted with respect to the relationships between various actors. Defendant was apparently hired by Sidhu and Ditta to represent the corporation, US Market #107, Inc. Defendant then hired Mumey in May 2008 to count cigarettes and lottery tickets. Kuenzi was apparently hired by a general manager of US Market #107, Inc., on behalf of Sidhu; defendant denied hiring Kuenzi but admitted that she had previously worked for his law firm as a private investigator and that he had known her for 20 years; he further admitted that, once she was hired by US Market #107, Inc., she "act[ed] as an investigator for [defendant] with respect to * * * US Market 107."

After viewing the footage a number of times, defendant concluded that, at "roughly 4:15" that afternoon, plaintiff had "removed a hand truck load of beer through the front door, turned right as if to go to his vehicle, and disappear[ed] off the monitor."

Defendant reached that conclusion despite the fact that Ivan—the person leaving with the loaded handcart in the video—did not resemble plaintiff,[2] and the fact that footage from another camera, which defendant apparently did not review, showed that plaintiff had remained inside the store at the counter during the relevant time. Defendant identified plaintiff as the person in the video even though he knew plaintiff and what plaintiff looked like because he had taken plaintiff's deposition earlier in the business litigation. Kuenzi also knew what plaintiff looked like, having delivered a letter to him regarding the business dispute.[3]

After defendant had reviewed the video footage in question, he suggested that they go to the store. Kuenzi told defendant she was "going to the market and going to summon the police." Just before 7:00 p.m., defendant, Kuenzi, and Mumey arrived there. By that time, plaintiff was no longer at US Market 107 but had gone, instead, to tend to matters at US Market 105.

Plaintiff later returned to US Market 107 and found defendant, Kuenzi, and Mumey there. Plaintiff went to the store's office area, which was in the back of US Market 107, to review security video footage on the store's computer to see what the three had been doing at the store. While plaintiff was in the back office, a police officer arrived at the store. Security video footage shows defendant, Kuenzi, and the police engaged in conversation for several minutes.[4]

---

[2] There is evidence in the record that Ivan was in his twenties, had a full head of hair, and was wearing a red, long-sleeved jacket in the video. Plaintiff, meanwhile, was 40 years old, mostly bald, and was wearing a white, short-sleeved shirt.

[3] The testimony by defendant, Kuenzi, and Mumey was consistent with defendant's theory that they actually saw a different video showing plaintiff stealing beer, not the video shown at trial.

[4] In his deposition testimony, read at trial, defendant said that he did not have a conversation with the police. Defendant also denied, in a request for admission, that he was aware, before law enforcement arrived at the market, that Kuenzi was going to have plaintiff arrested. That denial was read to the jury.

With Kuenzi standing just inside the front door of the store, and defendant standing just outside that open door, Kuenzi told police to arrest plaintiff.

The officer found plaintiff in the back office. He told plaintiff that police had received a request from "Diane Kuenzi to arrest [him] as a citizen arrest," and that plaintiff was in fact under arrest. Plaintiff was handcuffed and removed from the store. At the time plaintiff was arrested, neither Kuenzi nor defendant had talked with plaintiff or the other store workers, Ivan and Pedro, about the alleged beer theft. That was so even though defendant testified that, before plaintiff's arrest on June 26, 2008, he did not suspect plaintiff of stealing anything from the two markets plaintiff was running, and Kuenzi testified that she had not discussed any finding with defendant until that day and admitted that she had not found anything before then in her investigation into alleged fraud and theft at US Market 107.

Plaintiff was released the same day as his arrest and, along with Bains and plaintiff's own attorney, Swaim, returned to the store around 11:00 p.m. to review the purportedly incriminating video. The three men stayed approximately 30-35 minutes. They discovered that the video, as described above, shows Ivan, not plaintiff, with the handcart of beer bottles. They did not do anything with the store's computer other than watch the video.[5]

Mumey, however, believed that plaintiff, his attorney, and Bains had more sinister intentions regarding the security footage. Mumey was back at the corporate office at 11:00 p.m. and was monitoring the live video feed from US Market 107 when plaintiff, Bains, and Swaim entered the store. When those three began reviewing the earlier footage on the store computer, it interrupted the live feed to the corporate office, even though the cameras were still recording at the store. When Mumey saw his screen go blank, he assumed that it was because plaintiff was tampering with

---

[5] There is a factual dispute as to whether plaintiff tampered with the security video, and somehow deleted the portions that showed his theft. For purposes of this appeal, viewing the evidence in the light most favorable to plaintiff, we presume that plaintiff simply viewed the video and that it did not show any evidence of theft by plaintiff.

the security video. He then communicated that suspicion to defendant.

The very next day, June 27, defendant prepared and filed a motion and affidavit in the pending business litigation involving, among others, Bains and Sidhu. The motion stated:

*"During the past several weeks substantial evidence has been accumulated regarding a persistent pattern of thefts from the market.* During a review of the video materials from the market *[plaintiff] was observed removing approximately 5 cases of beer from the market.* No transfer was made to any other market. He was arrested on a Theft II complaint."

(Emphasis added.)

Defendant prepared, and attached to the motion, an affidavit signed by Mumey that stated:

"2. On 6/26/08, I [Mumey] *** reviewed videotape of [plaintiff] wheeling 4-5 cases of beer out of US Market #107 *** on a hand-truck to his white Suburban truck. The time of the occurrence was approximately 4:15 pm yesterday (06/26/08). The cases were sealed and full. I later verified that there had been no transfer of this beer to any other store. I also examined [plaintiff's] truck to find that materials were concealed under a baby blanket in his vehicle. I reported this back to Diane Kuenzi, a private investigator.

"3. [Plaintiff] was later arrested. During his arrest I observed him attempting to delete video from the computer that controls the surveillance cameras. I reported this to Officer Ramirez, the arresting officer, who instructed [plaintiff] to stop."

Plaintiff adduced evidence at trial that Mumey had only looked into plaintiff's truck, as described in the affidavit, at defendant's request. Mumey also acknowledged that his averment that plaintiff was attempting to delete files was based on his observation that plaintiff was sitting at the store's computer, moving and clicking the computer's mouse; he did not personally see plaintiff delete anything, and there was expert testimony that no one had tampered with the video.

Based on the motion and affidavit filed by defendant, the trial court, in the business litigation, appointed a receiver to take control of US Market 107. Afterwards, defendant wrote plaintiff's attorney a letter requesting that he hand over keys to the store:

"Please be advised that you and your client, and each of you, are willfully interfering with the appointed custodian of US Market #107. I would recommend that you avoid contempt charges by immediately turning over the keys to the building. If you have questions, kindly review the Order appointing the custodian. The custodian controls all access. He is well within his rights to demand the keys and bar you and Mr. Bains from the premises.

"Your failure to comply will yield a contempt order."

(Underscoring in original.) Plaintiff and Bains did not return to US Market 107.

The following month (August 2008), the charges against plaintiff were dismissed. In April 2010, he filed this action against defendant, alleging three claims: false imprisonment, malicious prosecution, and abuse of process. The case was tried to a jury and, after plaintiff presented the evidence described above, defendant moved for a directed verdict on all three claims. The court granted the motion, summarizing the evidence and its reasoning as follows:

"With respect to the false arrest, the salient facts, looked at in the light most favorable to the Plaintiff, are these. The Defendant's testimony is that he saw a theft on the video, but the video presented by the Plaintiff shows there is no theft.

"Number two, Ms. Kuenzi's testified—and this is uncontested—that she got the Defendant to come down to the office to look at the video. She caused him to come down to look at it. She initiated that. She said, 'Let's go to the store,' and then in her [deposition] said that the Defendant said, 'Let's go to the store.' So there's a question as to perhaps who said that first.

"Number three, Defendant said he can't remember talking to the officers. He says he checked the—I think it's called the borrow log, and then just observed—there's a video that was presented that shows him engaged in conversation

with officers and gesturing. Mr. Mumey says the cops spent most of the time talking to Diane. The unrefuted evidence is that Kuenzi is not his agent or employee. She was hired by Sidhu, paid by Sidhu, and worked with him rather than for him. Kuenzi also says the arrest was her idea, her decision, and she signs the arrest card.

"The Plaintiff says that this is enough to go to the jury because it shows that [defendant] was actively engaged in setting up the arrest. *The Court does not believe that this evidence shows that his conduct was a substantial factor in causing the arrest. There just is not enough there. And it seems to me, the fact that he was an attorney who was hired by these principals to perform a function as an attorney is the context against which we must look at these facts.*

"The tort of malicious prosecution and abuse of process, we have the uncontested fact that the Plaintiff never talked to this person, this attorney, had no problems with this attorney prior to the arrest. We know that this attorney used the fact of the arrest as evidence to get the court to appoint a conservator for the store and get Plaintiff removed from there. And the argument is that, since the video that the Plaintiff presented to the jury shows no arrest, therefore Defendant abused the process and participated. This is further evidence of malicious prosecution and ulterior purposes.

"And again, there is not enough there. I'm sorry, [plaintiff]. I feel I would be remiss in letting this case go to the jury. I understand your view that this video shows no theft. [Defendant] said, 'I saw video that shows a theft.' Yes, that's a question of fact. *But that alone is not enough to cause me to ask a jury to decide that this lawyer's acts were a substantial factor in causing an arrest that the other evidence shows unequivocally was not initiated by him.* He didn't look at the video first. He was called to come down and look at it. He was asked to accompany the person who was hired by the principal to do this.

"And the most he did, even looking at the light most favorable to you, was have some conversation with the officers. But Ms. Kuenzi said, 'It was my idea. I did it. It was my decision.' And frankly, she says this under oath today, knowing that there's another lawsuit against her for the same thing.

"So I just can't allow this case to go forward against an officer of the court, an attorney at law, and I'm not going to. I don't think I've ever directed a verdict before, but I'm going to do it in this case. So I'd like to bring the jury back in and tell them that they're done. \* \* \*."[6]

(Emphasis added.) The court then entered a general judgment in favor of defendant.

Now on appeal, plaintiff argues that the trial court erred in taking his claims away from the jury by way of a directed verdict. According to plaintiff, he presented evidence from which a jury could infer that defendant knew that plaintiff had committed no crime, yet nonetheless encouraged Kuenzi to report such a crime so that plaintiff would be arrested, thereby assisting defendant's ongoing business litigation against plaintiff's brother, Bains. Plaintiff argues that the jury, and not the court, should have decided whether or not to draw those inferences about defendant's intent. Defendant, meanwhile, reprises his arguments that he was nothing more than a "passive observer, in his capacity as the attorney for US Market 107, Inc., who was present at the time of plaintiff's arrest," and that "[a]ll of defendant's actions were within the scope of the attorney-client relationship and were privileged."

We address each of plaintiff's claims in turn, beginning with the tort of false imprisonment. The basic principles that apply to that tort—sometimes called false arrest—are "familiar and well settled." *Hiber v. Creditors Collection Service*, 154 Or App 408, 413, 961 P2d 898, *rev den*, 327 Or 621 (1998). "The gravamen of the claim is 'the unlawful imposition of restraint on another's freedom of movement,'" *id.* (quoting *Buckel v. Nunn*, 133 Or App 399, 405, 891 P2d 16 (1995)), and it consists of four elements: (1) the tortfeasor must confine the plaintiff; (2) the tortfeasor must intend the act that causes the confinement; (3) the plaintiff must be aware of the confinement; and (4) the confinement must be unlawful. *Hiber*, 154 Or App at 413.

---

[6] The court later clarified, "And let me say for the record that my summary is not the entirety of what I'm relying on. I'm also relying on [defendant's counsel's] arguments previously, just so we're not looking just at my \* \* \* perhaps cursory statements." That included defendant's argument that plaintiff had failed to offer any evidence that Kuenzi was defendant's agent for purposes of vicarious liability.

Of those elements, only the first two are genuinely at issue on appeal: whether *defendant*—as opposed to Kuenzi—actually caused plaintiff's confinement, and whether defendant intended as much.[7] Defendant submits that "Kuenzi initiated the arrest on her own without first discussing her decision to have plaintiff arrested with defendant," and that he was no more than an "innocent bystander" during the entire process. Were we viewing the evidence in the light most favorable to *defendant*, we might well agree with that characterization of Kuenzi's decision. But that is not how we review a directed verdict. *See Mauri*, 324 Or at 479 (requiring that facts be viewed in plaintiff's favor on a defendant's motion for directed verdict).

Although there is scant direct evidence of defendant's role in the arrest, there is ample circumstantial evidence that, when viewed most favorably to plaintiff, would allow a juror to find that defendant had an active and substantial role in Kuenzi's efforts to have plaintiff arrested. Kuenzi testified that she normally tells potential clients that she "will not work without an attorney" on fraud investigations. She further testified that, after watching the security video of the store, "I called [defendant] and I said, 'I think probably—you know, *you need to come down* and—and take a look at this, because I think I have probable cause for a—an arrest." (Emphasis added.) In an earlier deposition, portions of which were introduced at trial, Kuenzi testified, "I told [defendant] what I had, what had occurred, what I had seen. [Defendant] suggested we go over to the store." Defendant then went to the store, knowing that Kuenzi was going there and intended to call the police to arrest plaintiff; defendant accompanied Kuenzi as she spoke with officers at the store; and defendant stood just outside an open door while Kuenzi asked police to arrest plaintiff.

Based on those facts, a reasonable juror could infer that Kuenzi sought the approval of defendant, the attorney for US Market #107, Inc., before seeking to have plaintiff arrested on false charges, and that she only pursued

---

[7] Defendant appears to concede that the evidence, viewed in the light most favorable to plaintiff, is sufficient for a juror to find that defendant was aware of plaintiff's confinement and that plaintiff's confinement was unlawful. That concession is well taken.

plaintiff's arrest after defendant arrived at the office, reviewed the video, and concurred in a plan to falsely accuse plaintiff of theft. A juror could further infer that defendant encouraged Kuenzi's tortious conduct when defendant suggested that they go to the store, knowing that Kuenzi intended to summon police there, and by his continued presence, as corporate counsel, at the store site while Kuenzi had plaintiff arrested on false accusations of theft— including standing nearby as Kuenzi asked that plaintiff be arrested. In making those inferences, a juror could consider defendant's pretrial denials of knowledge that Kuenzi was going to call the police and that he had a conversation with the police, denials that were controverted by the evidence at trial.

That type of knowing and active encouragement of a false arrest is sufficient to prove "causation" of an unlawful confinement. Under Oregon law, a plaintiff "is not required to prove that the defendant was the sole, or exclusive, instigator of his arrest, but that the defendant participated by taking an active part in bringing about the arrest." *Pearson v. Galvin*, 253 Or 331, 337, 454 P2d 638 (1969). "Instigating" an arrest encompasses "words or acts which direct, request, invite or encourage the false imprisonment itself." *Restatement (Second) of Torts* § 45A comment c (1965), *quoted* in *Pearson*, 253 Or at 335. A jury, viewing the evidence most favorably to plaintiff, could find on this record that defendant was one of the "instigators" of the false arrest, and the court erred in concluding otherwise. *See Pearson*, 253 Or at 337 (explaining that the defendant could be held liable for false imprisonment where the "arrest of the plaintiff was a wholly foreseeable event, given the defendant's report that the aircraft had been 'stolen' and the withholding by the defendant of the fact that the defendant knew the identity of the person flying the plane").

Because we conclude that plaintiff presented sufficient evidence that defendant intentionally caused his confinement, we must address defendant's alternative argument—*i.e.*, that his actions were taken on behalf of his client, US Market #107, Inc., within the scope of the attorney-client privilege, and therefore cannot give rise to liability. *See generally Reynolds v. Schrock*, 341 Or 338, 351,

142 P3d 1062 (2006) (explaining circumstances in which a lawyer acting on behalf of a client can be shielded from tort liability). Defendant, in arguing that his acts were privileged, again fails to grapple with our standard of review on a motion for a directed verdict.

If we assume, for the sake of argument, that defendant's conduct was undertaken at his client's urging, and if a jury were to believe plaintiff's evidence and theory of the case—*i.e.*, find that defendant knowingly encouraged Kuenzi to initiate a false police report—then defendant's conduct necessarily falls outside the scope of the attorney-client privilege. In *Reynolds*, the Supreme Court explicitly stated that it "would consider actions by a lawyer that fall within the 'crime or fraud' exception to the lawyer-client privilege, OEC 503(4)(a), and Rule of Professional Conduct 1.6(b)(1), to be outside the lawyer-client relationship when evaluating whether a lawyer's conduct is protected." 341 Or at 351. Under the "crime or fraud" exception, "[t]here is no privilege * * * [i]f the services of the lawyer were sought or obtained to enable or aid anyone to commit or plan to commit what the client knew or reasonably should have known to be a crime or fraud." OEC 503(4)(a); *see also* Rule of Professional Conduct 1.6(b)(1) (providing that a lawyer may reveal client confidences when reasonably necessary "to disclose the intention of the lawyer's client to commit a crime and the information necessary to prevent the crime"). Initiating a false arrest is a crime, and acts that knowingly enable anyone to commit that crime are outside the scope of the privilege. *See* ORS 162.375(1) ("A person commits the crime of initiating a false report if the person knowingly initiates a false alarm or report which is transmitted to a fire department, law enforcement agency or other organization that deals with emergencies involving danger to life or property.").

The same is true even if defendant's client did not seek or obtain legal services with the intent or knowledge that defendant would commit a crime in the course of the representation—that is, if defendant helped to procure plaintiff's false arrest on his own initiative, without his client's knowledge. Because a lawyer cannot commit a crime on behalf of a client or to further the lawyer's own

self-interest, that conduct, too, would fall outside the scope of the attorney-client relationship for purposes of immunity. *See Reynolds*, 341 Or at 351 ("[T]he rule [concerning qualified privilege] protects lawyers *only for actions of the kind that permissibly may be taken by lawyers in the course of representing their clients.*" (Emphasis added.)); *id.* ("[T]he rule does not protect lawyers who are representing clients but who act only in their own self-interest and contrary to their clients' interest."); Rule of Professional Conduct 1.2(c) ("A lawyer shall not counsel a client to engage, or assist a client, in conduct that the lawyer knows is illegal or fraudulent * * *.").

Thus, we conclude that plaintiff presented sufficient evidence to survive a motion for a directed verdict on his claim of false imprisonment. The court erred in granting defendant's motion and entering judgment against plaintiff on that claim for relief.

Next, we turn to plaintiff's claim for malicious prosecution. To prove that claim, plaintiff was required to establish: (1) the institution or continuation of criminal proceedings; (2) by or at the insistence of the defendant; (3) termination of such proceedings in the plaintiff's favor; (4) malice in instituting the proceedings; (5) lack of probable cause for the proceeding; and (6) injury or damage because of the prosecution. *See Rose (Betty) v. Whitbeck*, 277 Or 791, 795, 562 P2d 188, *modified on denial of reh'g*, 278 Or 463, 564 P2d 671 (1977).

Defendant argued below, and the trial court agreed, that plaintiff had failed to prove the second and fourth elements of malicious prosecution, because there was no evidence that defendant (as opposed to Kuenzi) actually initiated the arrest or harbored any malice toward plaintiff. We view the record differently.

As previously explained with regard to the claim of false imprisonment, there is evidence in the record that defendant was a motivating factor in plaintiff's arrest. That same evidence suffices to create a jury question on the second element of plaintiff's claim for malicious prosecution—*i.e.,* whether the arrest and resulting prosecution were initiated

"by or at the insistence of" defendant, as opposed to only Kuenzi herself. *Gustafson v. Payless Drug Stores*, 269 Or 354, 363, 525 P2d 118 (1974) ("We have frequently said that the test of whether the defendant instigated the prosecution is, 'was defendant actively instrumental in putting the law in force? ***. To impose liability *there must be some affirmative action by way of advice, encouragement, etc.*'" (Emphasis added; omission in *Gustafson*.)).

The remaining question is whether a jury could infer not only that defendant initiated the proceedings, but that he did so with malice. For purposes of a malicious prosecution claim, "malice" is "defined as any primary purpose other than to bring a person to justice." *Ledford v. Gutoski*, 319 Or 397, 404, 877 P2d 80 (1994). In fact, "[t]he only reasonable inference that may be drawn from the defendant instituting a criminal prosecution for some primary purpose other than to bring the plaintiff to justice is that the defendant had a subjective intent to cause harm or injury to the plaintiff." *Id.* at 405; *see also Vazquez v. Reeves*, 138 Or App 153, 159, 907 P2d 254 (1995) (concluding that plaintiff adequately pleaded a claim for wrongful initiation against defendant lawyer who had allegedly assisted his clients in improperly obtaining a guardianship order and had shared his clients' purpose of using that order to "coerce [the plaintiff] into consenting to [the defendant clients'] adoption of [the plaintiff's] children").

Plaintiff argues that he offered sufficient evidence that defendant orchestrated the arrest in order to gain an advantage in the business litigation that involved, among others, US Market #107, Inc., Sidhu, and Bains, plaintiff's brother. Plaintiff relies on evidence that, on the day after he was falsely arrested, defendant filed a motion in the pending business litigation to have a receiver appointed based on the arrest—a motion that was granted and thereafter prevented plaintiff and Bains from entering the store. Plaintiff contends that that evidence, coupled with defendant's knowledge of plaintiff's innocence and of his clients' strong desire to have plaintiff and Bains removed from the store, gives rise to an inference that defendant was eager to further his clients'

goal and acted with a primary purpose other than bringing plaintiff to justice for the crime of theft.

That alleged purpose, defendant retorts, is too implausible to send to a jury, particularly because defendant had no preexisting relationship with plaintiff. According to defendant,

> "[t]here was no evidence that having plaintiff arrested would benefit defendant. * * * There was no evidence that defendant was personally involved in the business [of US Market #107, Inc.]. There was no evidence presented that would show defendant desired to harm plaintiff or would gain any benefit from harming plaintiff. In fact, plaintiff himself testified that he had not spoken with defendant or had any problems with him prior to the arrest. There was a complete lack of evidence on the elements of malice or ulterior purpose on the part of defendant."

We disagree with defendant's characterization of the facts and the law. Evidence that a defendant initiated an arrest without probable cause is, standing alone, generally sufficient to give rise to an inference of malice. *See Gustafson*, 269 Or at 366 ("Malice, unlike probable cause, is a question for the jury. * * * We consistently have held that the jury may make a finding of malice based upon lack of probable cause."). Here, though, there is even additional evidence from which a jury permissibly could infer that defendant falsely accused plaintiff of theft for purposes other than bringing him to justice. Viewed in the light most favorable to plaintiff, the evidence established that (1) defendant was counsel for US Market #107, Inc., in business litigation against plaintiff's brother, Bains; (2) defendant knew that the principals who had hired him wanted to remove plaintiff and Bains from the business; (3) defendant actively encouraged plaintiff's arrest knowing it to be based on false allegations; and (4) immediately thereafter, defendant used that false arrest to gain leverage in the business litigation against plaintiff's brother. On those facts, a juror could infer that such leverage in the litigation was not fortuitous but, rather, by design, and that defendant had initiated the false arrest for a purpose other than bringing plaintiff to justice for theft. That inference would be even easier to draw if the jury considered defendant's representation in

the motion—that over "several weeks" prior to the motion, "substantial evidence has been accumulated regarding a persistent pattern of thefts from the market"—to be false and contrary to Kuenzi's admission at trial that she had not uncovered anything in her investigation of fraud and theft until the day of plaintiff's arrest. Accordingly, we conclude that the trial court erred in taking that issue, and the other elements of the malicious prosecution claim, away from the jury by way of a directed verdict.[8]

For similar reasons, we conclude that the trial court erred in granting a directed verdict on plaintiff's claim for abuse of process based on the motion for appointment of a receiver. "Abuse of process is 'the perversion of legal procedure to accomplish an ulterior purpose when the procedure is commenced in proper form and with probable cause.'" *Larsen v. Credit Bureau*, 279 Or 405, 408, 568 P2d 657 (1977) (quoting *Kelly v. McBarron*, 258 Or 149, 154, 482 P2d 187 (1971)). Thus, to prevail on an abuse of process claim, a plaintiff must prove some ulterior purpose, unrelated to the process, and a willful act in the use of the process that is not proper in the regular conduct of the proceeding. *Larsen*, 279 Or at 408.

The trial court directed a verdict on the abuse of process claim on the ground that plaintiff had not presented sufficient evidence of an ulterior purpose for initiating the false arrest. For the reasons previously explained regarding malice, we disagree with that view of the record; there is evidence in the record that would allow a jury to infer that defendant encouraged plaintiff's false arrest for the purpose of capitalizing on that arrest in pending business litigation. The trial court therefore erred in granting a directed verdict on that claim as well.

In sum, we conclude that plaintiff, in his case-in-chief, presented sufficient evidence to support a verdict in

---

[8] Defendant, citing *Hiber*, 154 Or App 408, argues that his filing of the motion and affidavit for appointment of a receiver were "protected by the qualified privilege which attaches to an attorney's action in furtherance of a judicial proceeding." Suffice it to say that the privilege described in *Hiber* does not extend to acts done in bad faith or with malice. *See id.* at 415 ("[T]he attorney's privilege is not absolute, but rather is limited to actions taken in good faith and that otherwise do not involve maliciousness or deliberate misadministration of justice.").

his favor on claims for false arrest, malicious prosecution, and abuse of process. The court therefore erred in directing a verdict for defendant, so we reverse and remand the judgment.

Reversed and remanded.